# AFFIDAVIT OF SPECIAL AGENT ANDREW SNOW IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Andrew Snow being first duly sworn, whereby depose and state as follows:

## Introduction and Agent Background

1. I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been so employed since March 2016. I am currently assigned to the DEA High Intensity Drug Trafficking Area ("HIDTA") Task Force in Worcester, Massachusetts. Prior to my assignment to the Worcester HIDTA Task Force, I completed the twenty week DEA Basic Agent training academy in Quantico, Virginia, during which I successfully completed the requirements for graduation and was extensively trained in the investigation and enforcement of narcotics violations. Prior to my employment with the DEA, I was a police officer in Glocester, Rhode Island and East Providence, Rhode Island for a total of eight years, where I made numerous narcotics related arrests. During the course of my employment in law enforcement, I have received specialized training regarding the activities of narcotics traffickers and various aspects of narcotics investigation, including the methods used to (a) package, transport, and store and distribute narcotics and (b) conceal and launder the proceeds of narcotics trafficking.

2. In addition to my law enforcement training, I have experience investigating narcotics traffickers. I have participated in numerous narcotics investigations both as a Special Agent as well as a police officer, during which I have conducted physical surveillance, utilized confidential informants, executed arrest and search and seizure warrants, and conducted court-authorized electronic surveillance. I have testified at trials and hearings in federal, state, and municipal court.

3. Based on my training and experience, I am familiar with narcotics traffickers' methods of operation, including methods used by them to distribute, store and transport narcotics

and to collect, expend, account for, transport, and launder drug proceeds. I am also familiar with the manner in which narcotics traffickers often use their personal residences to distribute drugs, store drugs, collect drug debts, and store drug proceeds.

4. This affidavit is being submitted in support of an application for a warrant to search electronic equipment, specifically the smartphone depicted in Paragraph 17 ("the equipment"). The equipment is in the possession of law enforcement investigators, as described in Attachment A. There is probable cause to believe that the equipment contains evidence and constitutes an instrumentality of the distribution of cocaine, and the possession of cocaine with intent to distribute, in violation of Title 21, United States Code, Section 841(a)(1) (the "Target Offense").

5. I have been personally involved in an investigation into cocaine, heroin, and fentanyl trafficking in and around Worcester, Massachusetts that utilized various investigative techniques, including, but not limited to, the use of Title-III wiretaps of mobile phones used by multiple drug dealers. This investigation has resulted in the arrests and indictments of numerous drug traffickers based in Massachusetts and New York City, including Julio RIVERA.

6. The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant and does not set forth all of my knowledge about this matter.

**Probable Cause that RIVERA committed the Target Offense**

7. In late 2018, RIVERA was working as a school bus driver in Worcester, Massachusetts. Bank records for an account utilized by RIVERA show a large level of cash activity that seem inconsistent with the earnings of a school bus driver and that appear, based on my training and experience, consistent with cash activity of a drug trafficker. For example, an

2

account associated with RIVERA show cash deposits on October 15, 2018 exceeding $7,000.

8. In and around October 2018, the DEA was investigating the suspected cocaine trafficking activities of Person 1. Via a court-authorized wiretap, agents[1] intercepted phone calls during which Person 1 discussed the acquisition and distribution of cocaine.

9. On October 31, 2018, Person 1 indicated during an intercepted phone call that he anticipated obtaining drugs ("the work") the following day ("my friend told me it's going to be tomorrow").

10. On November 1, 2018, Person 1 stated during an intercepted call that "I'm waiting for a call from that fucker to go pick that up" (*i.e.*, that he was waiting for a call regarding the receipt of product).[2]

11. On November 1, 2018, at approximately 5:57 pm, agents observed Person 1 driving a black Chrysler Pacifica towards a self-storage facility on Millbury Street in Worcester, Massachusetts. Agents observed the Chrysler Pacifica pull immediately behind a black Chevrolet Suburban, and observed both vehicles pull into the self-storage facility in tandem. Approximately

---

[1] References in this affidavit to the actions or observations of "agents" refer to one or more agents or police officers, to include task force officers and/or Massachusetts State Police troopers. References in this affidavit to recorded phone calls are summaries of statements made during portions of those calls, and are not verbatim quotations or descriptions of the entire call. References are to preliminary English summaries of the recorded phone calls, although the actual statements during these calls were primarily made in Spanish. Quotation marks are used to refer to quoted portions of the preliminary English summaries, and should not be inferred as referring to verbatim portions of the original communications.

[2] Based on my understanding of this contemplated transaction, Person 1 was to obtain cocaine on November 1 and would subsequently re-distribute the cocaine in exchange for cash. Person 1 was not planning to provide cash upfront to the person from whom he was to receive cocaine on November 1.

five minutes later, agents observed both the Chrysler Pacifica and the Chevrolet Suburban exit the self-storage facility and travel in tandem.

12. Surveillance footage from the self-storage facility for November 1, 2018 shows the operators of the Chrysler Pacifica and the Chevrolet Suburban pulling into the parking area of the storage facility in tandem. Both vehicles proceeded to the same location within this parking area and stopped. Surveillance footage shows the operators of these vehicles exiting their vehicles and interacting with each other before entering a building together. The footage shows that, approximately 7 minutes after entering the building, both operators exited the building and re-entered their vehicles.[3] Both vehicles then departed the premises of the self-storage facility.

13. Subsequent investigation established that RIVERA shared a self-storage unit at this particular storage facility with his girlfriend/fiancée.

14. Shortly after 6pm on November 1, 2018, a Massachusetts State Trooper stopped the Chrysler Pacifica, which was being driven by Person 1. Agents searched the Chrysler Pacifica and located a box within a backpack; within this box was a compacted white powder substance. The DEA Northeast Laboratory has analyzed the substance seized from Person 1's vehicle and determined it to be cocaine hydrochloride, with a net weight of 900.9 grams.

15. At the time of the stop, Person 1 was in possession of two cell phones, including an iPhone associated with a phone number ending in -6580 ("Phone 1"). Agents noted that Phone 1 had six recent contacts with phone number 508-933-1210.[4] Based on my training and experience,

---

[3] The storage facility does not have surveillance footage of what occurred inside the building.

[4] Specifically, Phone 1 showed a 5:04 pm outgoing call lasting 44 seconds, a 5:20 pm outgoing call lasting 46 seconds, a 5:39 pm outgoing call lasting 2 minutes, a 5:46 pm outgoing call

and information developed concerning the drug trafficking activities of Person 1, I believe that Person 1 was utilizing Phone 1 to communicate with the individual who then distributed cocaine to Person 1 at the self-storage facility.

16. Agents maintained surveillance on the Chevrolet Suburban as it left the self-storage facility on November 1, 2018. The Suburban traveled around the block and passed by the ongoing stop of the Chrysler Pacifica, and then traveled around the block again. A Massachusetts State Trooper then stopped the Suburban. Julio RIVERA was the operator and sole occupant of the vehicle.

17. At the time of the stop of the Suburban, RIVERA had one cell phone on his person, and another phone was located on the front passenger seat of the Suburban. The phone located on the front passenger seat was a black alcatel model smartphone that was broken into two pieces. This smartphone is the equipment that I seek to authorization to search and it is depicted below:



---

lasting 2 minutes, a 5:55 pm incoming call lasting 1 minute, and a 5:58 pm incoming call lasting 1 minute.

18.     An agent in proximity to the Suburban called 508-933-1210 (the number with which Phone 1 had been in repeated recent contact). The agent noticed the equipment located on the front passenger seat of the Suburban to be ringing.

19.     Based on my training and experience, and the sequence of events outlined above, I believe that RIVERA utilized the equipment depicted above to communicate with Person 1 regarding the distribution of cocaine from RIVERA to Person 1.[5] I further believe that, at or around the time he was being stopped by the Massachusetts State Police, RIVERA attempted to destroy the equipment depicted above in order to prevent the discovery of evidence connecting him to drug-related activity.

20.     RIVERA has been charged with distributing cocaine to Person 1 on November 1, 2018. *See* 4:19-cr-40018-TSH; 4:19-mj-04000-DHH.

21.     Subsequent investigation established that Person 1 conspired with William TORRES, a resident of Toa Baja, Puerto Rico, to distribute cocaine. TORRES was the user of phone 939-281-0339.[6] TORRES has been charged with conspiring to distribute cocaine. *See*

---

[5] Based on my understanding of this transaction, Person 1 did not provide cash to RIVERA in exchange for the cocaine.

[6] According to information provided by the Puerto Rico Telephone Company (*d/b/a* Claro), the subscriber for 939-281-0339 is an individual with an address of URB Levittown Lakes, EDXX Calle Ayerra in Toa Baja, Puerto Rico. TORRES' Puerto Rico driver's license lists a residential and postal address of "URB Levittown EDXX C/FCO Ayerra Toa Baja, PR" ("XX" corresponds with two numerical digits known to the affiant). According to an Equifax Credit Header for TORRES, his current address is "ED XX Francisco Ayerra URB Levittown L Toa Baja, PR." Note that Levittown is part of the municipality of Toa Baja, Puerto Rico. Claro records for 939-281-0339 list one name under the header "Authorization Names" – "Willian Torres." I believe these records indicate that TORRES was an authorized user of the account associated with 939-281-0339, as the records indicate a SSN ending in 0578 (the actual last four digits of TORRES'

6

4:19-cr-40029-TSH; 4:19-mj-04212-DHH.

22. During an intercepted phone call on November 1, 2018, TORRES provided Person 1 with RIVERA's phone number ("933-1210").

23. T-Mobile records for RIVERA's phone (508-933-1210) show contact on November 1, 2018 between this phone and the phone used by TORRES (939-281-0339).

**Investigators' Possession of the Equipment**

24. The equipment is currently in the possession of the DEA, and is being stored at its facilities, as described in Attachment A. Investigators seized the equipment from the Suburban being driven by RIVERA on November 1, 2018.

25. Therefore, while the investigators might already have all necessary authority to examine the equipment, I seek this additional warrant out of an abundance of caution to be certain that its search will comply with the Fourth Amendment and other applicable laws.

**Probable Cause to Believe That The Equipment
Contains Evidence and Constitutes an Instrumentality**

26. The equipment is likely to contain call logs, text messages, and/or other records relating to RIVERA's phone communications, including but not limited to his communications with Person 1, TORRES, and/or others regarding the November 1, 2018 cocaine deal described above. The equipment is also likely to contain other records that demonstrate RIVERA's movements, contacts, financial transactions, and/or other aspects of his drug trafficking activity.

27. As discussed above, the equipment is currently being stored by investigators at their facilities as described in Attachment A. From my training and experience and the training and

---

Social Security number) and indicate a month and day that accurately correspond to TORRES' date of birth.

experience of law enforcement personnel who routinely handle this equipment, I understand that it has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when it first came into the investigators' possession.

28. Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones (which are included in Attachment B's definition of "hardware") can now function essentially as small computers. The equipment is a type of smartphone. Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

29. From my training, experience, and information provided to me by other agents, I am aware that individuals frequently use smartphones and mobile phones to carry out, communicate about, and store records regarding their daily activities. These tasks are frequently accomplished through sending and receiving e-mail, instant messages, and other forms of phone or internet based messages; scheduling activities; keeping a calendar of activities; arranging travel; purchasing items; searching for information including information regarding travel and activities; arranging for travel, accessing personal accounts including banking information; paying for items; and creating and storing images and videos of their movements and activities.

30. From my training, experience, and information provided to me by other agents, I am aware that individuals who engage in drug trafficking activity frequently use smartphones and mobile phones to facilitate their illegal activities, including to communicate with suppliers, customers, and co-conspirators. In addition, I am aware that individuals involved with drug

trafficking often utilize mobile phones to take, exchange, or receive photographs of drugs or drug-related proceeds, to plan or carry-out travel or movements relating to drug activity, to engage in financial transactions in funds derived from or intended for drug transactions, to maintain contacts of others involved in the drug trade, and for various other purposes.

31. From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B in mobile phones, computer hardware, computer software, and storage media.

32. Based on my knowledge, training, experience, and information provided to me by other agents, I know that data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the Internet. This is true because:

    a. Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

    b. Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    c. Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

    d. Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

## CONCLUSION

33. Based on the information described above, I have probable cause to believe that Julio RIVERA committed the Target Offense.

34. Based on the information described above, I also have probable cause to believe that evidence, fruits, and instrumentalities of the Target Offense, as described in Attachment B, are contained within the equipment described in Attachment A.

Sworn to under the pains and penalties of perjury,

_____
Andrew Snow
Special Agent, DEA

Subscribed and sworn to before me on Oct 18, 2019

_____
Hon. David H. Hennessy
Chief United States Magistrate Judge